UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) ) ) | Criminal Action No. 5: 13-114-DCR |
| V. | ) ) | |
| ISIAH MARQUIS MUNDY, | ) ) | **MEMORANDUM OPINION AND ORDER** |
| Defendant. | ) | |

\*\*\* \*\*\* \*\*\* \*\*\*

This matter is pending for consideration of Defendant Isiah Mundy's motion to suppress evidence obtained during his encounter with the Richmond police officers on April 18, 2013. [Record No. 14] The motion was referred to United States Magistrate Judge Robert E. Wier pursuant to 28 U.S.C. § 636(b)(1)(B). An evidentiary hearing was held on September 24, 2013. Thereafter, the Magistrate Judge issued his report, recommending that the defendant's motion be denied. [Record No. 27] On October 7, 2013, the defendant filed objections to the Recommended Disposition. [Record No. 32] After reviewing the Magistrate Judge's Recommended Disposition and having considered the parties' arguments, the Court will overrule Mundy's objections and deny his motion to suppress.[1]

**I.**

---

[1] While this Court must make a *de novo* determination of those portions of the Magistrate Judge's recommendations to which an objection is made, 28 U.S.C. § 636(b)(1)(C), "[i]t does not appear that Congress intended to require district court review of a magistrate's factual or legal conclusions, under a *de novo* or any other standard, when neither party objects to those findings." *Thomas v. Arn*, 474 U.S. 140, 150 (1985).

As noted by Magistrate Judge Wier, this case requires the Court to evaluate the propriety of the defendant's interaction with law enforcement on April 18, 2013. Mundy, a backseat occupant of a parked passenger car, argues that law enforcement officers improperly seized the car and him on the evening in question. The relevant facts are mostly undisputed and are summarized by Magistrate Judge Wier as follows:

> Richmond Police Detectives Joseph Lain and Rodney Tudor, both from the narcotics unit, were patrolling the area of Francis and E Streets in downtown Richmond in a black, unmarked Ford Taurus. Both officers identified the location as a high-crime area, indicating problems with theft, burglary, prostitution, fights, and drug activity. [Record No. 26, pp. 15-16, 59] At approximately 10:21 p.m., the officers, traveling east on Francis Street, turned left onto E Street. *Id.* at 17. A Ford Contour, ultimately identified as belonging to Julie Rice, was parked along the right-hand curb on E Street. The headlamps of the officers' car illuminated the Contour as it turned onto poorly-lit E Street, and Tudor noticed legs/feet sticking out of the open back passenger door. *Id.* at 60. Per Tudor, the legs protruded straight out of the vehicle — approximately 1.5 feet — and the feet were turned toward the 9-10 o'clock position. *Id.* at 61. The car was dark and police initially saw no one else in the vehicle. *Id.* at 23; 54.
>
> Tudor immediately pulled over, stopping in front of and catty-cornered to the Contour. *Id.* at 18. The record is contradictory on the spatial proximity of the vehicles. Lain indicated that Tudor parked approximately 8-10 feet from the Contour but close to the right-hand curb. *Id.* at 21-22, 41. Per Lain, the Contour's primary method of egress would have been to back up and drive forward around the police vehicle. *Id.* at 51 ("Without a shadow of a doubt, yes, they could have backed up just a couple of feet and drove around, yes."). Tudor, who admittedly was unsure about the distances, testified that he parked approximately 10 feet from the Contour, although he believed that the subject vehicle could have pulled forward, either to the left or the right, in addition to backing up as a route of leaving the area. *Id.* at 64-65. Tudor estimated parking the Taurus approximately 5-6 feet from the curb. *Id.* at 83. Finally, Rice testified that the officers' car fully blocked the Contour, completely preventing the vehicle from moving forward. She described the distance between the two vehicles as "pretty close," suggesting a margin of approximately 3 feet. *Id.* at 100. Finally, Ms. Gibbs indicated that the Contour could have exited only by backing up and reversing course. *Id.* at 108-09 ("[The Contour] could have only went on the sidewalk to get around the vehicle or on the other sidewalk to get around the

vehicle or to back – back up."). The photo in the record clearly shows the cruiser angled in front of and obviously in the near path of the Contour. [Record No. 20-2]

Lain immediately activated the emergency blue lights, exited the vehicle, and proceeded to the passenger side of the darkened Contour with his flashlight drawn. *Id.* at 19-20. Tudor briefly remained in the vehicle to radio in the location. *Id.* at 19. As Lain approached the vehicle, he announced himself as Richmond police and encountered Bradley Ashcraft in the driver's seat, Rice in the front passenger seat, and Mundy partially in the back passenger seat. *Id.* at 23-25. Lain described Mundy as lying sideways in the car, with his head near the center console and legs outside the door. Mundy rose up and turned toward the open door as Lain approached. *Id.* at 26-27.

Detective Lain engaged the individuals in basic conversation, describing Mundy as polite but nervous with trembling hands. *Id.* at 29, 32. Lain quickly noticed digital scales lying in the floorboard of the back passenger seat, in Mundy's area. *Id.* at 27, 28. Around this time, and just moments after the stop, Detective Tudor reached the vehicle and verbally identified the backseat passenger as Isiah Mundy. *Id.* at 30; *id.* at 66-67 (Tudor explained that he was personally familiar with Defendant. He had received numerous complaints of Mundy engaging in drug trafficking and had previously participated in drug investigations concerning Mundy.). Lain then asked Defendant to exit the vehicle. He complied, letting a cell phone drop from his hands to the street. *Id.* at 32. Rice and Ashcraft subsequently complied with officer requests to vacate the car. Rice admitted ownership of the Contour, and law enforcement searched the vehicle. A search uncovered from under the passenger seat, around Mundy's access point, a clear plastic bag containing 9 individually packaged plastic bags. [Record No. 20-9 (Exhibit I: nine bags)] The bags allegedly contained cocaine. Mundy consented to a search of his person, which revealed a second cell phone and $2,242.00 cash.

Officers arrested Mundy and ultimately charged him with 2 counts of trafficking in a controlled substance. In a Mirandized interview at police headquarters, Mundy admitted to trafficking in cocaine to support a personal use habit. *Id.* at 36. Officers released Rice from the scene and arrested Ashcraft on an unrelated state warrant.

[Record No. 27, pp. 2-4 (footnotes omitted)] On September 17, 2013, Mundy filed a motion to suppress, seeking to exclude all evidence obtained during the encounter and subsequent interview. [Record No. 14]

-3-

**II.**

Mundy argues that his initial contact with law enforcement constituted an illegal seizure, unsupported by reasonable suspicion, thus violating *Terry v. Ohio*, 392 U.S. 1 (1967), and its progeny. [*See* Record No. 14-1, pp. 4-7.] He contends that, due to this improper search and seizure, his constitutional rights were violated and that suppression of all evidence seized and the fruits thereof is necessary. [*Id.*, p. 7] Magistrate Judge Wier found that Mundy's motion to suppress should be denied. Specifically, the Magistrate Judge concluded that, based on the totality of the circumstances, law enforcement subjected the defendant to an investigative detention. However, the officers had articulable facts giving rise to a reasonable suspicion of possible criminal activity. [Record No. 27, p. 2] Thus, the detention of the defendant was proper under *Terry*. The Magistrate Judge also found that the exclusionary rule should not be applied, however, he declined to provide this as an alternative holding because the parties had not fully addressed the issue, and because of his conclusion that the defendant's encounter with the detectives constituted a lawful *Terry* stop.

Although Mundy agrees with the Magistrate Judge's conclusion that his initial encounter with Detective Lain and Tudor was a seizure under the Fourth Amendment, he objects to the finding that the law enforcement officers had a reasonable suspicion to initiate an investigative detention. [Record No. 32] He also objects to the Magistrate Judge's application of the exclusionary rule. The undersigned finds Mundy's objections to be without merit. Additionally, the undersigned disagrees with the finding that Mundy's initial encounter with Detectives Lain and Tudor constituted a seizure under the Fourth Amendment. [Record No. 27, p. 11]

### A. Mundy's Initial Encounter with Detectives Lain and Tudor was Consensual.

The Supreme Court recognizes three types of "permissible, warrantless encounters" between police and citizens: "(1) consensual encounters in which contact is initiated by a police officer without any articulable reason whatsoever and the citizen is briefly asked questions; (2) a temporary involuntary detention or *Terry* stop which must be predicated upon reasonable suspicion; and (3) arrests which must be based upon probable cause." *United States v. Pearce*, 531 F.3d 374, 380 (6th Cir. 2008) (quotation marks and citations omitted). A "seizure" under the Fourth Amendment "extends to any circumstance in which a police officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *United States v. Young*, 707 F.3d 598, 602 (6th Cir. 2012) (quotation marks and citations omitted). Thus, it is well-settled that not every interaction between individuals and police constitutes a seizure. Instead, a person is seized "within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (U.S. 1980). Conversely, a consensual encounter occurs where a reasonable citizen would feel free to disregard the police and go about his business. *United States v. Avery*, 137 F.3d 343, 352 (6th Cir. 1997). The Supreme Court has identified a number of factors relevant to determining whether an individual has been seized, including whether there was a "threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Mendenhall*, 446 U.S., at 555-56.

Mundy argues that a warrantless seizure occurred when the detectives blocked the Ford Contour, by pulling in front of the vehicle, and activating the cruiser's emergency lights. [Record No. 14-1, pp. 4-5] The magistrate judge concluded that, due to the position of the vehicles, the use of the emergency lights, the aggressive exit by Detective Lain, and the approach with flashlights establish that a reasonable person would not have felt free to leave the scene thus, transforming this encounter into a seizure. [Record No. 27, p. 11] The undersigned, however, concludes that the facts of this case are more analogous to those of *United States v. Carr*, 674 F.3d 570 (6th Cir. 2012). In short, the Court is unpersuaded that the defendant's encounter with Detectives Lain and Tudor was not consensual.

In *Carr*, the Sixth Circuit addressed how the positioning of a police vehicle can impact the propriety of a police-citizen encounter, thus transforming the interaction from consensual to a seizure under the Fourth Amendment. *Id.* at 572-75. While patrolling a high-crime area at night, the *Carr* detectives spotted the defendant's vehicle parked in a carwash bay, not being washed. *Id.* at 571. The area was known to the detectives as being a location for drug trafficking. *Id.* Unable to determine whether the vehicle was occupied and unaware of any visible illegal activity, the officers proceeded to investigate. *Id.* Upon approaching the defendant's vehicle the detectives momentarily activated emergency lights, parked their unmarked vehicle at an angle, approximately 12 feet from the defendant's vehicle's passenger side, partially blocking the defendant's vehicle but ultimately allowing the defendant multiple points of egress. *Id.* at 572 ("[T]he driver of the Tahoe, could have driven forward past the Explorer or, alternatively, could have backed out of the open carwash bay."). Two of the

detectives approached the defendant's vehicle on foot — one approaching the driver's side window and the other the passenger's side. *Id.* at 574. Once the detectives reached the vehicle they witnessed the defendant furtively moving and also observed a bag of marijuana inside the car. *Id.*

The Sixth Circuit found that the detectives' interaction with the defendant was consensual until he was asked to exit the vehicle. *Id.* at 574. In reaching this conclusion, the court distinguished the facts presented from those in *United States v. See*, 574 F.3d 309 (6th Cir. 2009), and *United States v. Gross*, 662 F.3d 393 (6th Cir. 2011). The *Carr* court emphasized that in *See* and *Gross* law enforcement blocked all avenues of egress by parking directly in front of or behind the defendant's car. *Carr*, 674 F.3d at 573. ("In *See*, the court appears to have made this the sole basis for finding that a *Terry* stop occurred: '[g]iven the fact that [the officer] blocked See's car with his marked patrol car, a reasonable person in See's position would not have felt free to leave.' Carr's case stands in contrast to both *See* and *Gross* because Carr was not blocked into the carwash bay, but rather could have left through either the front or the rear of the bay.") (quoting *See*, 574 F.3d at 313). Additionally the court noted that the detectives' use of emergency lights and their action of approaching the vehicle on both sides of the vehicle did not transform the consensual stop into a seizure. *Id.* at 573 ("An encounter does not become compulsory merely because a person identifies himself as a police officer.") (citing *O'Malley v. City of Flint*, 652 F.3d 662, 669 (6th Cir. 2011)).

While the Court agrees with the Magistrate Judge that the relevant inquiry does not boil down to a mere physical impossibility test of potential avenues of egress, the undersigned does

not agree that, in view of all other relevant factors, the balance weighs in favor of an investigatory stop. [Record No. 27, pp. 8-9] As the Magistrate Judge found, although the detectives' unmarked cruiser was maneuvered in the direct path of the vehicle occupied by the defendant, the vehicle would have been able to back-up and then exit to the front or rear. However, the driver "could not simply have steered forward." [*Id.*, p. 8] Thus, the positioning of the detectives' vehicle does not weigh in favor of a seizure. *See Carr*, 674 F.3d at 573; *see also United States v. Hinojosa*, No. 12-2258, 2013 U.S. App. LEXIS 17634, at *6-7 (6th Cir. Aug. 23, 2013) (holding that the officer's placement of his hand on his gun as he approached the defendant was not threatening or coercive and concluding that since the officers left the defendant reasonable means of egress the police-citizen encounter was not an investigative detention or seizure); *compare with*, *United States v. Williams*, No. 12-5844, 2013 U.S. App. LEXIS 9123, at *6-11 (6th Cir. May 2, 2013) (finding that the totality of circumstances, including the continuously running alley lights, the blocked-in vehicle, and the law enforcement's probe of the vehicle with a flashlight weighed in favor of an investigatory detention).

But the Court's analysis does not stop here. Once the detectives pulled in front of the Ford Contour, the detectives activated the emergency lights and left them flashing. Detective Lain exited the vehicle and quickly approached the defendant's position with his flashlight drawn. Notably, however, both Detective Lain and Tudor were in plain street clothes with tactical vests. Although the backs of these vests are inscribed with the word "POLICE" in large print, the fronts of these vests only have a small police emblem. [Record No. 26, p. 20]

Nonetheless, Detective Lain was wearing his badge around his neck and identified himself as a police officer when he approached the car and began talking with the occupants. The Magistrate Judge found that these factors to be indicative of coercive conduct. [Record No. 27, pp. 10-11] The undersigned disagrees with this determination.

While the officers' use of emergency lights might tend to demonstrate the stop was compulsory, the Court is not inclined to draw this conclusion.[2] *See Carr*, 674 F.3d at 576. The record indicates that the detectives illuminated emergency lights to provide notice that they were, in fact, law enforcement officers despite the fact that they were: (i) not clearly visible; (ii) in an area known to be an area of drug trafficking activity; (iii) in an unmarked car; and (iv) in plain clothes. The emergency lights conveyed the message that the officers did not intend to harm the occupants of the vehicle while at the same time providing a degree of safety for the officers. [*See* Record No. 26, pp. 24-25 (Testimony of Detective Lain discussing the activation of the police emergency lights: "For me it's officer safety. When I exit the vehicle, especially in a high crime area like that, I don't want anybody — if there are occupants in the vehicle, I don't want anybody to feel like we're going to cause them any harm or that we're there to do them any harm. And then other traffic that might come up and down that road, you know, I want them to know that obviously there's a vehicle parked there and, you know, it's an emergency vehicle."); *compare with, Id.*, p. 97 (Testimony of Rice indicating that if an unmarked car had pulled up in front of her car and individuals got out and ran toward her vehicle that she would have been

---

2    The Magistrate Judge notes that law enforcement's use of emergency lights "require drivers in Kentucky to yield the right of way." [Record No. 27, p. 10 (citing KRS §§ 189.930(1),(2); 520.100)] However, a driver is not "seized" under the Fourth Amendment by being required to yield the right of way. A contrary conclusion would lead to illogical results.

"scared" but that the emergency lights allowed her to identify the individuals as law enforcement).] Importantly, at the time the officers approached the vehicle, they were uncertain of the number of occupants in the car, or if any potential occupant would be able to view only a quick illumination of the emergency lights. In short, while the illumination of the emergency lights is relevant to the issue of whether the encounter was consensual or compulsory, it is not dispositive.

Likewise, Detective Lain's use of his flashlight to illuminate the vehicle when he approached and his subsequent statement of identification as a police officer does not transform this otherwise consensual stop into an investigatory detention. *See Carr*, 674 F.3d at 573 (citing *O'Malley*, 652 F.3d, at 669). Additionally, to suggest that a law enforcement officer's use of his flash light when approaching an unknown situation, at night and in the dark, is an indicia of a non-consensual stop is counterintuitive to principles of safety and common sense. *See*, *e.g.*, *Williams*, 2013 U.S. App. LEXIS 9123, at *14 (holding that law enforcement's use of a flashlight "to probe the parked vehicle's interior was not an excessive intrusion given [officer's] numerous observations and his existing knowledge that certain goods had been reported stolen from vehicles in the lot"). Using a flashlight in the dark is common practice for both law enforcement officers and civilians alike. A person's election to use a flashlight would seem even more obvious when confronted with the possibility of criminal activity or bodily harm. Moreover, there is neither evidence that the flashlights were used to direct or control Mundy or the other occupants of the vehicle, nor is there evidence that the flashlights were used in an overly intrusive manner.

Notably, despite a number of variables, there is no evidence that Detectives Lain and Tudor approached with their weapons drawn (or that they were even visible), and there was no physical contact between the detectives and Mundy. *See Mendenhall*, 446 U.S., at 555-56. There is no indication that the detectives' use of language or tone of voice conveyed a message that compliance with anything the detectives said was mandatory. *See id.*; *see also United States v. Peters* 194 F.3d 692, 697 (6th Cir. 1999). Moreover, there was not a "threatening presence of several officers." *Mendenhall*, 446 U.S., at 555. Indeed, it was only Detective Lain, by himself, whom first approached Mundy's position, with Detective Tudor following shortly behind. *See United States v. Oliver*, No. 3: 09-CR-144-R, 2012 U.S. Dist. LEXIS 92988, at *13 (W.D. Ky. July 5, 2012) (holding that while two officers approaching on foot did not present sufficient coercive indicators, the presence of four officers "warrants the opposite conclusion" because "[s]urrounding a suspect increases the odds that he or she will not feel at liberty to end the encounter"); *see also United States v. Clements*, 522 F.3d 790, 794-95 (8th Cir. 2008) (concluding that an interaction was consensual where police did not surround the suspect's vehicle with "multiple squad cars or officers or otherwise prevent [the suspects] from driving away"). The Court is unpersuaded that there was any coercive behavior by the detectives that rendered this encounter non-consensual.

In light of all the circumstances presented, the Court concludes that the detectives actions during their initial interaction with the defendant, either individually or in the aggregate, do not constitute an unlawful seizure. Rather, Mundy's subsequent arrest followed a consensual encounter with law enforcement. *See Hinojosa*, 2013 U.S. App. LEXIS 17634, at *6 (citing

*Michigan v. Chesternut*, 486 U.S. 567, 573-74 (1988); *United States v. Campbell*, 486 F.3d 949, 954 (6th Cir. 2007)). However, even if Mundy's initial encounter with Detectives Lain and Tudor constituted a seizure, thus implicating the Fourth Amendment, the detectives had reasonable suspicion, supported by specific, articulable facts, that criminal activity was occurring. *See United States v. Arvizu*, 534 U.S., at 273-74.

**B.     Reasonable Suspicion Existed to Initiate an Investigative Detention.**

Magistrate Judge Wier correctly concluded that Detectives Lain and Tudor had reasonable suspicion of criminal activity when they initially encountered Mundy. Therefore, this interaction was proper under the Fourth Amendment. [Record No. 27, p. 16] Mundy objects to the Magistrate Judge's finding, arguing that the detectives proceeded on a hunch with no particularized knowledge about the occupants of the vehicle. [Record No. 32, p. 6] Mundy attempts to analogize the facts of this case with those of *Gross* and *See*. However, the defendant's main contention rests on his belief that, in light of all the other relevant circumstances of this matter, law enforcement encountering a pair of legs sticking out of the rear passenger door of a unlit vehicle at a ten o'clock angle would not constitute a reasonable and articulable suspicion that illegal activity was on-going.

In *See* the Sixth Circuit found that following facts were insufficient to provide law enforcement officers with the requisite level of reasonable suspicion to justify a *Terry* stop:

> (1) it was 4:30 a.m.; (2) the men were parked in a high-crime area; (3) before beginning his shift, Williams had been instructed to pay special attention to non-resident loiterers because of a recent increase in robberies; (4) there were three men in the car; (5) the car's interior light was off; (6) the car was parked away from the apartment building in a dim portion of the lot; and (7) the car did not have a front license plate.

*See*, 574 F.3d at 314. Mundy's argument on this point fails to recognize that the facts of *See* are distinguishable from those presented here. Specifically, in *See* there was no indication of someone breaking into the vehicle.[3]

Magistrate Judge Wier correctly found that the detectives identified sufficient articulable facts to support a reasonable suspicion of possible criminal activity to justify a brief *Terry* detention. [Record No. 27, p. 14] Specifically, the detectives: (i) identified the location as a high-crime area and that they had received complaints of drug transactions occurring specifically occurring in vehicles parked along the side of the road; (ii) the vehicle itself was completely dark with no interior or exterior lights, it was late at night, and the area itself was poorly lit; and (iii) Mundy's position in the vehicle was indicative of a potential break-in and; (iv) the officers did not view any other individuals in or around the vehicle. [*Id.*]

While contextual factors such as being in a high-crime area are not be afforded significant weight, they cannot be ignored. The Court must examine the "totality of the circumstances" of the case to determine "whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002); *see id.* ("This process allows officers to draw on their own experience and specialized training to make

---

3   Although Mundy relies on *Gross* in support of his contention that there was no reasonable suspicion here for a *Terry* stop, the government did not attempt to argue that the law enforcement officer had a reasonable suspicion that criminal activity was potentially underway. *See* 662 F.3d at 400 (noting that the government did not attempt to argue that the officer had a particularized and objective basis for suspecting the defendant of criminal activity, but instead attempted to argue that the officer's "community-caretaking function required [the officer] to investigate the facts further"). Indeed, the law enforcement officer "admitted at the suppression hearing that at the time he exited the car, it was safe to say that he was not aware that there was any crime being committed." *Id.* Regardless, the facts of *Gross* are distinguishable from those presented here. As noted above, the detectives identified a particularized and objective basis for suspecting that criminal activity was on-going and, therefore, a *Terry* stop was warranted.

inferences from and deductions about the cumulative information available to them that might well elude an untrained person.") (citing *Ornelas v. United States*, 517 U.S. 690, 699 (1996) (noting that appellate courts must "give due weight to inferences drawn from [the] facts by resident judges and local law enforcement")). Each of the factors identified by Magistrate Judge Wier are proper considerations in examining whether the detectives had a particularized and objective basis for suspecting criminal activity.

Although not specifically raised in his objections, Mundy asserted during oral argument before the undersigned that the fact that the detectives immediately pulled over after witnessing the defendant's feet sticking out of the vehicle was indicative of the detective's lack of reasonable suspicion. Counsel argued that the detectives should have waited and watched for "at least thirty seconds, [or] some period of time" to try and identify with more particularity what was actually going on inside the vehicle. [October 9, 2013, Hearing Transcript, p. 24] This argument is unpersuasive.

Under the circumstances presented, requiring a police officer to pull in front or behind a vehicle in which criminal activity is suspected presents a substantial likelihood of simply alerting potential occupants of the officer's presence, thus allowing him to hide the fruits of his crime or prepare to engage the officer with dangerous force. Under such circumstances, law enforcement officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available." *Arvizu*, 534 U.S. at 273.

Magistrate Judge Wier correctly concluded that "[t]aken together in the totality of the circumstances, and giving each factor appropriate weight, the cited factors are sufficient and reasonable to support a brief *Terry* detention to investigate initial suspicions of criminal activity." [Record No. 27, p. 15] Mundy's orientation in the back seat, in context of all the other relevant factors discussed above, is a sufficient particular and specific circumstance. In other words, the officers acted on more than a mere hunch. *See United States v. Sokolow*, 490 U.S. 1, 15 (1989). Thus, Magistrate Judge Wier correctly concluded that the detectives activities complied with *Terry*, and Mundy's objections are without merit.

### C. Alternatively, the Good-Faith Exception to the Exclusionary Rule Is Applicable.

The parties did not elaborate on the full suppression analysis, failing to address the propriety of the exclusion. [Record No. 27, p. 16] Notwithstanding this deficiency, Magistrate Judge Wier found that suppression would serve no deterrent value and, therefore, exclusion would not be warranted. [*Id.*, p. 18] Magistrate Judge Wier, however, did not offer this as an alternative holding in light of the parties' failure to address the issue and because he had already concluded that there was reasonable suspicion for the stop. [*Id.*, p. 16]

Mundy briefly addresses this issue in his objections, arguing that exclusion is appropriate. [Record No. 32, pp. 9-10] Specifically, he contends that the "fact that the officers' conduct was not necessarily flagrant is not enough to save the fruits from the otherwise unlawful search and seizure from exclusion." [*Id.*, p. 10 (citing *Gross*, 662 F.3d at 401-06)] Mundy's argument concerning the applicability of the exclusionary rule is misplaced.

Suppression is not an automatic consequence of a Fourth Amendment violation. *See Hudson v. Michigan*, 547 U.S. 586, 591 (2006) ("Suppression of evidence . . . has always been our last resort, not our first impulse."); *see also Herring v. United States*, 555 U.S. 135, 137 (2009). Indeed, where the suppression of evidence, even when obtained in violation of a defendant's Fourth Amendment right, fails to yield appreciable deterrence, exclusion is unwarranted. *See Davis*, 131 S. Ct. at 2426-47 ("Real deterrent value is a 'necessary condition for exclusion,' but it is not a 'sufficient' one.") (quoting *Hudson*, 547 U.S. at 596)). For exclusion to be appropriate, courts must perform a balancing test to determine whether the deterrent benefits of suppression outweigh the substantial costs of "almost always requir[ing] courts to ignore reliable, trustworthy evidence." *Davis v. United States*, 131 S. Ct. 2419, 2427 (2011); *see also United States v. Master*, 614 F.3d 236, 242-43 (6th Cir. 2010). In weighing the deterrent benefits of exclusion, courts should focus on the culpability of the law enforcement conduct at issue and, where law enforcement acted with "deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs." *Davis*, 131 S. Ct. at 2427 (quotation marks and citations omitted). The Sixth Circuit recently reaffirmed this analysis, stating that:

> To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system. As laid out in our cases, the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence.

*United States v. Fugate*, 499 F. App'x 514, (6th Cir. 2012) (quoting *Herring*, 555 U.S. at 144).

Mundy argues that there was no reasonable and articulable suspicion for the detectives' stop, that there were no intervening circumstances, and that there was no appreciable passage of time between the illegal stop and the discovery of the evidence. [Record No. 32, p. 9] He contends that the fact that the officers' conduct was not necessarily flagrant is not enough to prevent the application of the exclusionary rule. [*Id.*, p. 10] This argument ignores clear precedential jurisprudence that for "exclusion to be appropriate, the deterrence benefits of suppression must outweigh its heavy costs." *Davis,* 131 S. Ct. at 2427.

As noted by Magistrate Judge Wier, the detectives presented an objective basis for their actions to resolve an uncertain situation which more than logically implicated potential criminal activity or public safety concerns. Moreover, the officers identified and explained real and justifiable, subjective reasons for the actions they took and the manner in which they approached the unknown vehicle at night, in a high crime area, from an unmarked cruiser and in plain clothes. The detectives' actions were consistent with their testimony that they approached the vehicle in the manner they did with a focus on personal and public safety. The record of this matter is devoid of any evidence which suggests that law enforcement acted with deliberate, reckless, or grossly negligent disregard for Mundy's Fourth Amendment rights. Thus, suppression of the evidence would have little to no deterrent value. *See Higgins*, 557 F.3d at 391.

### III.

For the reasons discussed above, it is hereby

**ORDERED** as follows:

1. As noted in section **II. A**. of this Memorandum Opinion and Order, the Court finds that Defendant Mundy's initial encounter with Detectives Lain and Tudor was consensual. Otherwise, the Recommended Disposition of Magistrate Judge Robert E. Wier [Record No. 27] is **ADOPTED** and **INCORPORATED** by reference.

2. Defendant Mundy's objections to the Magistrate Judge's Recommended Disposition [Record No. 32] are **OVERRULED**.

3. Defendant Mundy's Motion to Suppress [Record No 14] is **DENIED**.

This 16th day of October, 2013.

Signed By:
*Danny C. Reeves* DCR
United States District Judge